# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **JOAN WADELTON**, *et al*,<br><br>Plaintiffs,<br><br>v.<br><br>**DEPARTMENT OF STATE**,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)     Civil Action No. 13-cv-412 (TSC)<br>)<br>)<br>)<br>)<br>) |

## MEMORANDUM OPINION[1]

Plaintiffs Joan Wadelton and the news website Truthout filed suit under the Freedom of Information Act ("FOIA") against the Department of State ("State"), seeking to compel the release of records relating to Wadelton's tenure at the agency. After several years of litigation and several rounds of briefing, this court entered summary judgment in favor of State on September 22, 2016. Plaintiffs request attorney's fees based primarily on the court's denial of State's proposed disclosure schedule and the denial of State's first motion for summary judgment. For the reasons set forth below, the court will GRANT Plaintiffs' fee petition in part, and DENY the petition in part.

---

[1] This court previously issued an order, ECF No. 80, granting in part and denying in part the Plaintiffs' motion for fees. *See* ECF No. 68. This Memorandum Opinion explains the court's reasons for that Order.

# I. BACKGROUND

Wadelton joined State in 1980 and worked her way up to the highest rank short of the Senior Foreign Service. Compl. ¶ 7. She alleges that State's Bureau of Human Resources ("HR") began treating her unfairly around 2000 when she learned that HR planned to "remove" her from her position. She protested and later filed a complaint with the Office of Inspector General ("OIG") about alleged abuses by HR. *Id.* ¶¶ 14-18. Wadelton claims that because of her complaints—despite having outstanding performance reviews—she suffered retaliation, including reduction of responsibilities, HR's submission of her incomplete personnel file to authorities considering her for promotion, and threats to force her into involuntary retirement. *Id.* ¶¶ 18-19, 22. Wadelton responded by filing grievances with the Foreign Service Grievance Board ("FSGB") which ordered State to reconsider her for some of the promotions she had unsuccessfully sought. *Id.* ¶¶ 20-28.

Wadelton claims that during her employment at State, she collected evidence demonstrating that the treatment she received from HR was just one example of widespread misconduct. *Id.* ¶ 15. She sought to prove that several high-level HR managers were manipulating the selection board promotion process to benefit themselves and their allies. *Id.* To that end, Wadelton provided Congressional representatives with information about HR's activities, after which several representatives became involved, and the Government Accountability Office announced an impending investigation. *Id.* ¶¶ 33-39. Wadelton also lodged additional complaints with the OIG on multiple occasions, and she claims OIG ultimately issued a report criticizing HR's procedures and accusing the department of mismanagement and falsifying information. *Id.* ¶¶ 31, 35.

Consistent with the directive from the FSGB, State reconsidered Wadelton for some of the promotions she had sought, but refused to reverse its prior decisions. *Id.* ¶¶ 34-35. Wadelton then sued the agency in January 2011. *See Wadelton v. Clinton*, 11-cv-49-BJR (D.D.C.).[2] State terminated her several months later in March 2011, allegedly in retaliation for her whistleblowing activities. Compl. ¶¶ 14-40.

In July and October of the following year, Wadelton submitted three separate FOIA requests to State, seeking records pertaining to her employment. *Wadelton v. Dept. of State*, 941 F. Supp. 2d 120, 121 (D.D.C. 2013). Specifically, she sought records from three departments within the agency: (1) the HR department, (2) the Office of Legal Advisor ("L"), and (3) the Under Secretary of Management ("M"). *Id.*

On January 29, 2013, State informed Wadelton that it had identified eighteen responsive records from M and agreed to release eight records in full, but was withholding six records in full and would coordinate with other offices regarding the remaining four records. Compl. ¶ 63. State did not inform Wadelton whether it had searched and/or identified records located in the L and HR offices. *See id.* ¶¶ 47-63.

On February 4, 2013, Wadelton's attorney wrote State requesting expedited processing and informing the agency that Truthout would be joining Wadelton's FOIA requests. *Id.* ¶¶ 49, 56, 64. After failing to obtain the relief they sought and exhausting all administrative remedies, Plaintiffs filed a Complaint and a Motion for Preliminary Injunction, seeking expedited processing of the FOIA requests on April 1, 2013 (nine months after the first FOIA request). *Id.* ¶¶ 51, 58, 65-67; ECF Nos. 1, 3.

---

[2] The court granted summary judgment for the Defendant in the promotion lawsuit.

On April 25, 2013, the Judge previously assigned to this case denied Plaintiffs' motion for a preliminary injunction. 4/9/2013 Minute Order; *Wadelton*, 941 F. Supp. 2d 120. State subsequently released the remaining records from the active M files and identified over 6,000 potentially responsive pages from the L files, as well as roughly 3,500 potentially responsive pages from HR. ECF Nos. 16, 18. In light of the number of potentially responsive pages, the need to review "retired" M files, and a multi-layered review process, on July 1, 2013, State sought a production schedule requiring review of 700 pages per month over a nineteen-month period. ECF No. 16. State explained that the analyst assigned to review the retired M files was doing so on a "part-time basis" because of competing responsibilities in other cases. *Id.* p. 4. Further, all records produced were subject to a second level of review, normally conducted by retired Foreign Service officers working on a part-time basis. *Id.* Moreover, because discovery in Wadelton's promotion lawsuit was ongoing, documents had to be reviewed for privilege by the Legal Advisor's office before being produced. *Id.*

Plaintiffs objected to State's proposed schedule for several reasons. First, they argued that an *Open America Stay*[3] was appropriate, rather than the briefing schedule State had

---

[3] Pursuant to FOIA 5 U.S.C. § 552(a)(6), "the Government may obtain a stay of proceedings "if the Government can show exceptional circumstances exist and that the agency is exercising due diligence in responding to the request.'" *Elec. Frontier Found. v. DOJ*, 517 F. Supp. 2d 111, 116 (D.D.C. 2007) (citing 5 U.S.C. § 552(a)(6)(C)(I)). In *Open America v. Watergate Special Prosecution Force*, 547 F.2d 605, 616 (D.C. Cir. 1976) (citing § 552(a)(6)(C)), the D.C. Circuit held that

> "exceptional circumstances exist" when an agency, like the FBI here, is deluged with a volume of requests for information vastly in excess of that anticipated by Congress, when the existing resources are inadequate to deal with the volume of such requests within the time limits of subsection (6)(A), and when the agency can show that it "is exercising due diligence" in processing the requests.

proposed, because of the extended period State needed to finish processing the records. Plaintiffs argued that State was attempting to circumvent the normally high standard of proof required for an *Open America* stay by simply requesting an extended briefing schedule.

Next, Plaintiffs asserted that State had not shown it was incapable of reviewing more than 700 pages per month, and that the multiple sequential levels of review were unnecessary. Plaintiffs noted that State had released only sixteen documents (totaling forty-eight pages) during the prior three months, and withheld twenty-five pages, and thus had not demonstrated any real effort to process the records at the proposed 700-page monthly rate. Plaintiff therefore asked the court to order State to complete review and production of non-exempt records in six months, by December 31, 2013, and to file its dispositive motion on or before January 17, 2014.

The court found that sequential reviews were unnecessary, explaining that State was going to have "to do it simultaneously instead of wait and wait . . . ." ECF No. 73, Aug. 29, 2013 Tr. pp. 14-17. Accordingly, the court ordered State to complete production of the HR and M records by March 31, 2014, almost a year earlier than State's proposed deadline. *Id*.; ECF No. 26. The court also advised State to reallocate employees to finish the project if necessary, noting that "[i]t would have been better if this thing had gone on faster long ago." Aug. 29, 2013 Tr. pp. 19, 22-23.

State met its deadline with respect to the HR and M records, after which the court held a status conference on June 10, 2014, to set the deadlines for producing the L records and a briefing schedule. The court agreed to State's production deadline of February 2, 2015 for the L records but rejected its request for a single round of briefing and instead set a deadline for the

first round of briefing on the already released records. The case was then transferred to the present Judge.

During the first round of briefing, State completed production of the L records, but the parties were unable to agree on a production schedule for the second round of motions. ECF No. 50. After argument and additional briefing, the court ordered State to file its motion earlier than it had requested. April 15, 2015 Min. Order.

Shortly thereafter, the court denied State's first motion for summary judgment because the agency had not provided enough information in its declarations for the court to resolve issues regarding the adequacy of the search and the segregability of released documents. *Wadelton v. Dep't of State*, 106 F. Supp. 3d 139 (D.D.C. 2015). State then asked the court to allow supplemental briefing on the deficiencies identified in the court's Memorandum Opinion and allow the agency to combine this briefing with the briefing on the L records. ECF No. 57. Over Plaintiffs' objection, the court granted State's request and ordered it to file the supplemental motion by July 30, 2015. June 15, 2015 Min. Order. The court ultimately granted State's supplemental summary judgment motion. *Wadelton v. Dep't of State*, 208 F. Supp. 3d 20 (D.D.C. 2016).

Plaintiffs subsequently filed a fee petition requesting $18,511.50 in attorney's fees and $711.25 in costs. *See* ECF Nos. 67, 68.

## II.    ANALYSIS

Under FOIA, courts "may assess against the United States reasonable attorney fees and other litigation costs reasonably incurred in any case . . . in which the complainant has substantially prevailed." 5 U.S.C. § 522(a)(4)(E)(i). The fee inquiry is divided into two prongs,

which this Circuit has long described as fee "eligibility" (whether the Plaintiff has "substantially prevailed" and thus "may" obtain fees), and fee "entitlement" (whether the court "should" grant the fee request). *Brayton v. Office of the U.S. Trade Representative*, 641 F.3d 521, 524 (D.C. Cir. 2011) (citation omitted). If the court determines that a plaintiff is eligible for attorney's fees, the court then proceeds to the entitlement analysis to consider whether the facts warrant awarding fees. *Elec. Privacy Info. Ctr.* (hereinafter "EPIC") *v. FBI*, 72 F. Supp. 3d 338, 343 (D.D.C. 2014) (citing *Judicial Watch, Inc. v. U.S. Dep't of Commerce*, 470 F. 3d 363, 368-9 (D.C. Cir. 2006)). "Congress, in authorizing the award of attorneys' fees, left to the traditional equitable discretion of the courts the decision whether such fees are appropriate in any given disclosure case." *Fenster v. Brown*, 617 F.2d 740, 742 (D.C. Cir. 1979).

## A. Eligibility for Attorney's Fees

A plaintiff need not obtain "court-ordered relief on the merits" of the FOIA claim to "substantially prevail" for eligibility purposes. *Brayton*, 641 F.3d at 525. Rather, a plaintiff substantially prevails when she "obtain[s] relief through . . . a voluntary or unilateral change in position by the agency, if the complainant's claim is not insubstantial." 5 U.S.C. § 552(a)(4)(E)(ii). Plaintiffs claim they are eligible for attorney's fees because a considerable portion of the first order on summary judgment favored Plaintiffs, and they successfully petitioned the court to impose production schedules that were more demanding than those State proposed.[4]

---

[4] The court ordered State to produce the requested records almost a year sooner than State's proposed deadline, ECF No. 73, Aug. 29, 2013 Tr. pp. 14-17; ECF No. 26, and denied State's request and supplemental request for an extension to file the second summary judgment motion. Minute Order, April 15, 2015.

State concedes that Plaintiffs are eligible for fees, *see* Defs. Resp. p. 1, and the court agrees. Plaintiffs secured a "unilateral change in position by the agency," that was not insubstantial, given State's contention that it needed sequential document reviews and eighteen months in which to complete the process. *See* 5 U.S.C. § 552(a)(4)(E)(ii); *Citizens for Responsibility and Ethics in Washington,* (hereinafter "CREW") *v. DOJ*, 820 F. Supp. 2d 39, 44 (D.D.C 2011) (finding that, even though the court adopted the government's proposed disclosure schedule, plaintiff had "substantially prevailed" because prior to the court's scheduling order the government had no obligation to produce the records by a specified date, therefore there had been a change in the "legal relationship" between the parties).

**B. Entitlement to Attorney's Fees**

To determine whether a "substantially prevailing" FOIA plaintiff is "entitled" to fees, the district court must assess four factors: "(1) the public benefit derived from the case; (2) the commercial benefit to the plaintiff; (3) the nature of the plaintiff's interest in the records; and (4) the reasonableness of the agency's withholding." *Davy v. CIA*, 456 F.3d 162, 166 (D.C. Cir. 2006) (quoting *Tax Analysts v. U.S. Dep't of Justice*, 965 F.2d 1092, 1093 (D.C. Cir. 1992)). "No one factor is dispositive, although the court will not assess fees when the agency has demonstrated that it had a lawful right to withhold disclosure." *Davy v. C.I.A.*, 550 F.3d 1155, 1159 (D.C. Cir. 2008) (hereinafter "*Davy II*") (citation omitted). In assessing these factors, courts must remain cognizant of the purposes of FOIA's attorney fee provision. *Republic of New Afrika v. F.B.I.*, 645 F. Supp. 117, 120 (D.D.C. 1986) (citing *LaSalle Extension Univ. v. FTC*, 627 F.2d 481, 483 (D.C. Cir. 1980)). The first is "to encourage individuals to make use of FOIA in cases where the benefits will accrue to the public." *Republic of New Afrika*, 645 F. Supp. at

120 (citing *LaSalle Extension*, 627 F.2d at 484)). The second is to "compensate victims of agency obduracy and to deter agencies from engaging in further behavior not in keeping with FOIA's aims. [Since] these policies promote multiple congressional goals, a court should not regard any one factor as conclusive." *Republic of New Afrika*, 645 F. Supp. at 120 (citing *LaSalle Extension*, 627 F.2d at 484)).

### 1. Public Benefit Derived from the Case

Because FOIA was enacted to inform the public, the requested records should disclose information which would serve Congress' intent "to open agency action to the light of public scrutiny." *Tax Analysts v. United States Dep't of Justice*, 845 F.2d 1060, 1066 n.12 (D.C. Cir. 1988) (citing *Dep't of the Air Force v. Rose*, 426 U.S. 352, 361 (1976)). Thus, "simple disclosure of governmental documents does not satisfy the public [benefit] factor." *Alliance for Responsible CFC Policy*, *Inc. v. Costle*, 631 F. Supp. 1469, 1471 (D.D.C 1986) (citing *Fenster v. Brown*, 617 F.2d 740, 744 (D.C. Cir. 1979)). Instead, the public benefit factor considers whether "the complainant's victory is likely to add to the fund of public information that citizens may use in making vital political choices." *Cotton v. Heyman*, 63 F.3d 1115, 1120 (D.C. Cir. 1995) (citation omitted).

State argues—with no citation to legal authority—that Plaintiffs have not shown a "public benefit" because Truthout has not published an article about Wadelton's litigation. ECF No. 79, Defs. Br. p. 10. The court is unpersuaded by this argument, since, as the D.C. Circuit has recognized, in assessing the public benefit factor, the court must consider "both the effect of the litigation for which fees are requested and the potential public value of the information sought." *Davy II*, 550 F.3d at 1159 (citation omitted).

Plaintiffs' litigation has already contributed to public discourse. Approximately three weeks after Wadelton filed this lawsuit, The Atlantic magazine published an article about the longstanding absence of an inspector general at State.[5] David. W. Brown, *The State Department Needs a Watchdog-Now, Not Later*, The Atlantic, Apr. 23, 2013. The article noted that the inspector general's office investigates internal grievances and "questionable activities," and, because of the lack of an inspector general, Foreign Service officers were appointed to lead OIG positions for extended periods of time—a practice the article described as "inconsistent with professional standards for independence." *Id.* It cited Wadelton's case as an example of the problems arising from the absence of an inspector general, and discussed Wadelton's allegations that State's HR department retaliated against her after she accused it of criminal wrongdoing in doctoring FSGB results.

Similarly, several months after The Atlantic article appeared, a website for security clearance related jobs and news published an article about the problems created by the absence of a permanent inspector general at State.[6] David Brown, *Flawed Administration = Ineffective Policy*, ClearanceJobs.com, Sept. 18, 2013. The article claimed that the lack of leadership could cause policy failures with life-or-death consequences. It cited a State employee who claimed that State had ignored employee complaints about inadequate security systems, removed those who expressed concerns about the systems, and barred those employees from further focus groups. The article noted the parallels between State's response to the employee's story and the

---

[5] https://www.theatlantic.com/politics/archive/2013/04/the-state-department-needs-a-watchdog-now-not-later/275198/

[6]  https://news.clearancejobs.com/2013/09/18/reliable-foreign-policy-hampered-administrative-failures/

attack on the U.S. Embassy in Benghazi, where complaints about security had allegedly been ignored. It suggested that re-establishing trust at the agency would involve assuring employees that State would not retaliate against whistleblowers like Wadelton.

Not only do these articles impact the public benefit analysis, but the D.C. Circuit has instructed lower courts to evaluate the "potential" or "likely" value of the requested records when considering the public benefit factor. *See Cotton*, 63 F.3d 1115 at 1120; *Davy II*, 550 F.3d at 1159 (explaining that the public benefit factor requires consideration of, *inter alia*, the "potential public value of the information sought"). Wadelton's allegations of wrongdoing, coupled with governmental investigations and media attention regarding the leadership vacuum at the OIG, are sufficient to convince this court that the requested records had more than "potential" or "likely" public value. *See Yonemoto v. Dep't of Veterans Affairs*, No. CV 06-00378 BMK, 2012 WL 1980818, at *3-4 (D. Haw. June 1, 2012) ("[Employee's] FOIA action benefitted the public because it shed light on how the VA interacts with personnel. . . . It is in the public interest to ensure that an agency treats its employees fairly and appropriately."), *aff'd*, 549 F. App'x 627 (9th Cir. 2013); *Prison Legal News v. EOUSA*, No. 08-1055, 2010 WL 3170824, at *2 (D. Col. Aug. 10, 2010) (finding public benefit from disclosure of records despite the fact that "the population to which this information is likely to be disseminated is relatively small," as "information about how the BOP responded to the murder may inform the public as to its effectiveness in maintaining security and order inside of [a] prison"); *Morley v. CIA*, 810 F. 3d 841, 844 (D.C. Cir. 2016) ("[W]e clarify that the public-benefit factor requires an *ex ante* assessment of the potential public value of the information requested, with little or no regard to whether any documents supplied prove to advance the public interest.").

## 2. Commercial Benefit and Nature of Plaintiffs' Interest

This Circuit typically analyzes two factors—commercial benefit and nature of plaintiffs' interest—together to determine whether plaintiffs have "a sufficient private incentive to seek disclosure" of the records without expecting compensation. *Davy II*, 550 F. 3d at 1160 (quoting *Tax Analysts*, 965 F. 2d at 1095). Requestors "who have a private commercial interest in disclosure" have a "sufficient incentive to pursue their claim through the courts," even in the absence of a fee award. *See Fenster v. Brown*, 617 F.2d 740, 743 (D.C. Cir. 1979). Similarly, requestors who seek records of "minimal" public interest for "personal, rather than scholarly [or] journalistic . . ." purposes have a sufficient incentive to file a FOIA request, *Simon v. United States*, 587 F. Supp. 1029, 1032 (D.D.C. 1984), and therefore "should not be encouraged by an award of attorney fees." *Republic of New Afrika*, 645 F. Supp. at 121. State argues that Wadelton is not entitled to fees because she sought the records for use in her employment lawsuit, and cites to several cases where courts denied fees for requestors who sought records to aid in non-FOIA litigation or proceedings. *See id.*; *Ellis v. United States*, 941 F. Supp. 1068, 1079 (D. Utah 1996); *Polynesian Cultural Ctr., Inc. v. N. L. R. B.*, 600 F.2d 1327, 1330 (9th Cir. 1979).

State ignores the fact that Wadelton was not the sole plaintiff in this matter; media outlet Truthout joined Wadelton's FOIA request intending to publish "one or more in-depth" articles about "Wadelton's case and the underlying problems facing the State Department personnel system." ECF No. 8, Pls. Prelim. Injunction Mot. Response at Ex. B, Leopold Decl. ¶ 3. Indeed, then Truthout journalist Jason Leopold wrote an article about Wadelton and sought approval to publish the article, but it appears it was never published. *Id.* The reasons for this are unclear, but

clearly there was media interest in the requested records.  As this Circuit has recognized, "a court would ordinarily award fees, for example, where a [journalist] was seeking information to be used in a publication."  *Nationwide Bldg. Maint., Inc. v. Sampson*, 559 F.2d 704, 712 (D.C. Cir. 1977).

Moreover, any private interest Wadelton may have had in obtaining the records does not necessarily disqualify her from obtaining fees.  In *Piper v. United States Department of Justice*, 339 F. Supp. 2d 13, 21 (D.D.C. 2004) the court awarded fees even though the plaintiff sought records regarding his mother.  Noting that the plaintiff, a published author, intended to write a book about the records, the court reasoned:

> There is little doubt that plaintiff is motivated by a distinct personal interest in the documents he is seeking. . . .  This factor could then weigh against plaintiff in isolation.  But the notion that a private interest and public interest "must be mutually exclusive is not supportable." *Playboy Enters., Inc. v. U.S. Customs Serv.,* 959 F. Supp. 11, 16 (D.D.C. 1997).  Often times, "such benefits and interests are not so easily separable, and in this case we have both." *Id.*  Here, plaintiff intends to write a book about his mother's kidnapping and the FBI investigation into it and resulting DOJ criminal prosecution.  This scholarly endeavor further contributes to the public fund of knowledge. . . .

339 F. Supp. 2d 13, 21–22, 25 (alterations omitted); *Playboy Enterprises v. U.S. Customs Serv.*, 959 F. Supp. 11, 17 (D.D.C. 1997) ("[T]he mere fact that the information sought might be of benefit to Plaintiff in pursuing [litigation] does not diminish the substantial public benefit that may have resulted.").

### 3.  Reasonableness of the Agency's Decision

Fees may not be awarded if, in responding to a FOIA request, the government took a position that was "correct as a matter of law."  *Brayton v. Office of the U.S. Trade Representative,* 641 F.3d 521, 525–26 (D.C. Cir. 2011).  Accordingly, the court must examine

whether the government "had a colorable or reasonable basis" for its position.  *Davy II*, 550 F.3d at 1163.

State argues that this factor weighs in its favor because the court ultimately found that the agency did not improperly withhold records.  But this argument ignores State's positions regarding processing and disclosure of the records.  During the initial stages of the litigation, State did not provide a reasoned explanation for why it needed eighteen months and sequential rounds of review to process the records, and at several later intervals, the court ordered State to move more quickly than it had claimed to be able to do.  Accordingly, the court finds State did not have a colorable or reasonable basis for the positions it maintained.

Because the four entitlement factors weigh in favor of Plaintiffs, the court finds that they are entitled to fees.

## C. Fee Calculation

Having found that Plaintiffs are entitled to fees, the court must examine whether they demonstrated "the reasonableness of both the number of hours and the hourly rate."  *EPIC v. United States Dep't of Homeland Sec.*, 218 F. Supp. 3d 27, 47 (D.D.C. 2016) (citation omitted). Kelly McClanahan, Executive Director of National Security Counselors,[7] was Plaintiffs' lead counsel.  Pls. Ex. B.  In addition to his J.D., which he earned in 2007, McClanahan has a Master's in Security Studies from Georgetown University, and an LLM from the Georgetown University

---

[7] According to its website, National Security Counselors "was founded to further the twin ideals that the public needs to be as informed as possible about what its government does in the name of national security, and that people entangled in legal matters in this field should have reasonable access to knowledgeable legal assistance, regardless of income." http://www.nationalsecuritylaw.org/home

Law Center. *Id.* He has worked on FOIA matters since he earned his J.D.; thus, he had close to six years of FOIA experience when this litigation began in April 2013. *See id.*

McClanahan seeks $18,511.50 in fees[8] and $711.25 in costs,[9] declaring that he spent "well over 50 hours" prosecuting this case, but he seeks reimbursement of only 31.8 hours (divided by tenths of an hour), explaining that he:

1. "removed a significant majority of the telephone calls between myself and government counsel";

2. "made a reasonable effort to remove approximately all of the time spent performing work on matters on which Plaintiffs did not substantially prevail. Because I contemporaneously recorded the time I spent working on a filing or reviewing a document, I approximated how much of that time was spent on work on which we prevailed by calculating the number of pages in the document in question which pertained to an issue on which we prevailed, dividing that number by the total number of pages in the document to get a rough percentage of the amount of the document containing relevant information, and multiplying that percentage by the time spent doing work pertaining to that document. In the below chart outlining the work for which I am seeking fees, I have indicated the percentage and the total time in the "Work Description" column when this has occurred";[10]

3. "removed a significant amount of time spent reviewing FOIA releases and developing challenges to their withholdings";

---

[8] This amount is based on $15,106.70 for time billed through the filing of the final summary judgment motion, plus $3,404.80 for time spent drafting the fee petition and reply brief. ECF No. 68, Pls. Br. p. 8; ECF No. 76.

[9] State objects to an award of costs, arguing that Plaintiffs are not prevailing parties. Having found that Plaintiffs are entitled to fees, the court will award costs. *See* 5 U.S.C. § 552(E) ("The court may assess against the United States reasonable attorney fees and other litigation costs reasonably incurred in any case under this section in which the complainant has substantially prevailed.").

[10] McClanahan states that he has "conscientiously . . . remov[ed] most of the time spent on work which did not directly lead to useful results and spent on telephone conversations," as well as "the approximate time spent working on matters on which Plaintiffs did not substantially prevail." Pls. Br. pp. 7-8 & n.3.

4. refrained from billing "for any time spent by my partner or interns";

5. refrained from billing "for any time spent preparing the settlement offer on fees" and discussions with State relating to same;

6. "endeavored throughout this case to minimize the amount of time spent doing research or writing"; and

7. attached a chart listing his billable hours "with brief descriptions of the work performed."

McClanahan Dec. ¶¶ 3-10; Pls. Br. p. 1, 8 n.3 (emphasis in original); *see* ECF No. 67.

McClanahan contemporaneously recorded his time on a spreadsheet that he later used to create the chart, which includes entries such as "[d]rafted and filed reply for scheduling," "reviewed draft of Vaughn and emailed challenges to" State, and "[d]rafted and filed oppo to PSJ (38% of 3.6)" hours. McClanahan Decl. ¶¶ 10-11; *id*. p. 3.[11]

The petition seeks reimbursement at the following rates: $383 per hour for work performed before June 1, 2013, and $393, $581, and $586 per hour respectively for each successive year, as well as $608 per hour for the time spent drafting the fee petition and reply. Pls. Br. p. 7; Pls. Reply p. 11. In support of his rate request McClanahan submitted:

1. His resume;

2. An affidavit explaining how he calculated the requested hours;

3. A December 2013 declaration by economist Dr. Michael Kavanaugh explaining why he believes the LSI *Laffey* fee matrix is superior to the government's fee matrix;

4. A September 1996 Kavanaugh declaration explaining the same; and

---

[11] Given the date of the entry, presumably "PSJ" refers to State's partial summary judgment motion.

5. The LSI *Laffey* fee matrix rate chart.

ECF No. 68. State challenges both the requested rate and the number of hours billed.

**1. Reasonable Hourly Rate**

A "fee applicant bears the burden of establishing entitlement to an award, documenting the appropriate hours, and justifying the reasonableness of the rates" and the opposing party remains "free to rebut a fee claim." *Eley v. D.C.*, 793 F.3d 97, 100 (D.C. Cir. 2015) (citation omitted). The reasonableness of the hourly rate "turns on three sub-elements": (1) the billing practices of the attorney, (2) "the attorney's skill, experience, and reputation," and (3) "the prevailing market rates in the relevant community." *Id.*

As the D.C. Circuit has observed:

> Determining the prevailing market rate is "inherently difficult." *Blum*, 465 U.S. at 895 n. 11, 104 S. Ct. 1541. Even so, "the complexity of the market for legal services does not reduce the importance of fixing the prevailing hourly rate in each particular case with a fair degree of accuracy." *Nat'l Ass'n of Concerned Veterans v. Sec'y of Def.*, 675 F.2d 1319, 1325 (D.C. Cir. 1982). Thus, a fee applicant must "produce satisfactory evidence—<u>in addition to</u> the attorney's own affidavits—that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation." We allow a fee applicant to submit attorneys' fee matrices as one type of evidence that "provides a useful starting point" in calculating the prevailing market rate. *Covington*, 57 F.3d at 1109. The most commonly used fee matrix is the "*Laffey* Matrix. . . .
>
> Fee matrices in general are "somewhat crude" and the *Laffey* Matrix in particular "lumps attorneys with four to seven years of experience in the same category" as well as "attorneys with eleven to nineteen [years]." *Covington*, 57 F.3d at 1109. For this reason, a fee applicant supplements fee matrices with other evidence such as "surveys to update them; affidavits reciting the precise fees that attorneys with similar qualifications have received from fee-paying clients in comparable cases; and evidence of recent fees awarded by the courts or through settlement to attorneys with comparable qualifications handling similar cases." *Id.*

*Eley*, 793 F.3d at 100–01 (emphasis in original) (some citations and alterations omitted).

"In this jurisdiction, public interest attorneys without a customary billing rate, such as [the] lawyers here, typically calculate their rates using a version of the billing rate matrix developed in *Laffey v. Northwest Airlines, Inc.*, 572 F. Supp. 354, 371 (D.D.C. 1983), to determine prevailing hourly rates for complex litigation." *EPIC. v. United States Drug Enf't Admin.*, 266 F. Supp. 3d 162, 170 (D.D.C. 2017). Because it was developed over thirty years ago, the *Laffey* matrix rates must be adjusted for inflation. *Salazar ex rel. Salazar v. D.C.*, 809 F.3d 58, 62 (D.C. Cir. 2015) (citations omitted). Here, the parties champion two different versions of the adjusted *Laffey* matrix—the USAO matrix and the LSI matrix, neither of which is without flaws.

State urges the court to use the pre 2015[12] version of the matrix maintained by the Civil Division of the local U.S. Attorney's Office (the "USAO matrix"), which was developed from a 1982 sample of billing rates, Pls. Ex A, Kavanaugh 12/11/13 Decl. ¶¶ 9-10, and is adjusted annually

> by adding the change in the cost of living for the Washington, D.C. area to the applicable rate for the prior year, and then rounding to the nearest multiple of $5. Changes in the cost of living are measured by the Consumer Price Index for All Urban Consumers (CPI–U) for the Washington–Baltimore metropolitan area, as provided by the Bureau of Labor Statistics. This Consumer Price Index 'combines the price changes of over a hundred thousand diverse commodities into a single measure, including "such diverse items as personal computer prices, funeral expenses, and movie tickets."

*CREW v. DOJ*, 142 F. Supp. 3d 1, 21 (D.D.C. 2015), *dismissed sub nom*. No. 15-5344, 2016 WL 4098772 (D.C. Cir. July 14, 2016) (citations omitted).

---

[12] In 2015 the U. S. Attorney's office updated its USAO matrix. *See Gatore v. U. S. Dept. of Homeland Sec.*, 286 F. Supp. 3d 25, 34 n.5 (D.D.C. 2017). Although the parties did not address it, the court will discuss this updated matrix below.

State submitted the September 2015 declaration of economist Dr. Laura A. Malowane,[13] who opines that the USAO matrix more accurately reflects local complex federal litigation rates because, *inter alia*, the CPI-U measures price changes in the local economy, rather than nationally. ECF No. 70, Defs. Ex. A, Malowane Dec. ¶¶ 7, 37-39, 43. Malowane also asserts that the USAO matrix is more accurate because its rates are more closely in line with the average rates reported in a 2011 survey of Washington, D.C. area law firms across a variety of sizes and practices. *See id.* ¶¶ 15- 17.

Because the 2011 survey did not provide insight into the rates for "federal litigation" services in this jurisdiction, Malowane also reviewed a 2014 survey of national billing rates for litigation attorneys. *Id.* ¶¶ 17-25. She adjusted the rates in the 2014 Annual Survey of Law Firm Economics to estimate local rates by applying a "geographic inflator based on information provided from the 2014 Survey. The geographic inflator is simply a compilation of attorney rates in a specific geographic area, each divided by a corresponding average national rate for attorneys with similar years of experience." *Id.* ¶¶ 17-20. Applying the geographic inflator, Malowane found that the USAO matrix rates were consistent with the 2014 survey rates, while the LSI matrix rates were more than $200 per hour higher for attorneys with 21- 30 years of experience. *Id.* ¶¶ 21-25.[14] The court notes that, between June 2014 and May 2015, the LSI rates for attorneys with McClanahan's eight years of experience range from $187 per hour to

---

[13]   Both parties' expert reports were prepared for litigation in other FOIA cases.

[14]   In the case for which Malowane prepared her declaration, the attorneys seeking fees had more than twenty years of experience. *See* Malowane Decl. ¶10

$266 per hour above the median, top 25% and top 10% of national law firm rates found in the 2014 survey.  *See* Malowane Table 3; Pls. Ex. A, LSI Matrix.

Critics have noted problems with the USAO matrix and Malowane's declaration.  In 2015, the D.C. Circuit noted that "less than 0.325 percent of the data" in the CPI–U index used for the USAO matrix "involve[] legal services."  *Eley*, 793 F.3d at 101 (alterations and citations omitted).  Accordingly, as Plaintiffs' expert Dr. Kavanaugh points out, adjusting legal services billing rates using the CPI-U gives more weight to price fluctuations in non-legal goods and services.  *See* Pls. Ex. C, Kavanaugh 9/26/16 Decl. ¶ 9; Pls. Ex. A, Kavanaugh 12/11/13 Decl. ¶ 16.  Moreover, Kavanaugh explains that in general "there are two strong forces exerting pressure on prices over time," but where a broad index like the CPI-U is used "the specific supply and demand effects are suppressed and only the effect of inflation is captured."  Pls. Ex. C, Kavanaugh 9/26/16 Decl. ¶ 9.

Here, as in at least one other case, Malowane "does not explain the methodology underlying the data or provide the Court with the survey[s she reviewed], saying only that [they] are 'available for purchase.'"  *CREW v. DOJ*, 80 F. Supp. 3d 1, 4 n.1 (D.D.C. 2015).  In addition, with respect to the 2011 Washington area survey, Malowane admits the data did not include rates specifically charged for "federal litigation" services.  Malowane Decl. ¶ 17.  However, her solution to this problem—using a 2014 national survey adjusted using a geographic inflator— had its own problems.  First, the 2014 survey did not include specific rates for FOIA cases or even federal litigation, so Malowane used the survey's "other litigation category."  *Id*. n.8.  She explains that relying on this category was a "conservative" choice because it provided the second and third highest rates of all the available litigation categories for attorneys practicing 21-30

years.  *Id.*  But, the 21-30 year practice group is not applicable for McClanahan, who had been

practicing for almost six years when this litigation began.  Additionally, the 2014 national survey

"is not D.C.-specific" and Malowane's calculations "rest[] on various assumptions including that

D.C. rates match either the Southern Atlantic Region [including West Virginia, Delaware, North

Carolina, Georgia and Florida] or other highly populated areas."  *CREW v. DOJ*, 142 F. Supp. 3d

at 21.

Plaintiffs urge the court to use the "Legal Services Index Matrix" or "LSI Matrix"

developed by Kavanaugh, and based on a 1989 survey of rates, rather than the 1982 survey of

rates from which the USAO matrix was developed.  Pls. Ex. A, Kavanaugh 12/11/13 Decl. ¶ 23.

In Kavanaugh's opinion, "the more contemporary the observation, the less possibility exists for

forecasting error."  *Id.*  His LSI matrix "accounts for inflation using the Bureau of Labor

Statistics' legal services index [CPU-LSI], which is based on the price movement of specific flat-

fee legal services such as preparing a brief, attending a deposition, and handling a no-fault

divorce, living wills, and traffic violations."  *CREW*, 142 F. Supp. 3d at 16–17.  According to

Kavanaugh, using a legal services inflation index is better than using a broad inflation index—

like the CPI-U used for the USAO matrix—because as discussed above, legal services only

account for a small percentage of the prices measured in the latter.  *See* Pls. Ex. C, Kavanaugh

9/26/16 Decl. ¶ 9; Pls. Ex. A, Kavanaugh 12/11/13 Decl. ¶ 16.  Moreover, the CPI-U does not

capture supply and demand forces, but "only the effect of inflation."  Pls. Ex. C, Kavanaugh

9/26/16 Decl. ¶ 9.

The LSI matrix and its reliance on the CPU-LSI also has its critics.  Rather than tracking

legal fee inflation levels specific to this jurisdiction, the LSI matrix tracks changes in the cost of

legal services nationally.  *Ely*, 793 F.3d at 102 (citation omitted); Malowane Decl. ¶ 39.

Malowane points out that the Bureau of Labor Statistics has indicated that the CPU-LSI is

"primarily" derived by evaluating price changes in the provision of "specific flat fee services,"

rather than hourly billed services.  *Id*. ¶¶ 43-47; *id.* n.26.  As such, she concludes that the rates

include costs incurred for filing fees, travel expenses, document fees, postage and other

miscellaneous items.  *Id*. ¶ 48.  Malowane noted that a 2009 National Law Journal survey found

that law firms who offer alternative billing and maintain a Washington D.C. main office derived

only 8% of their revenue from flat rate billing.  *Id*. ¶ 50.

Finally, Malowane contends that small public interest law firms are equivalent to small

commercial firms, which, in her opinion, generally charge lower rates than large firms.  *Id*. ¶ 26.

Relying on a 2014 National Law Journal ("NLJ") 350 Annual Survey, she concludes that the LSI

matrix rates overcompensate small firm lawyers, pointing out that the LSI matrix rates exceeded

the average billing rates for partners at the nation's largest law firms with Washington D.C. main

offices.  *Id* ¶¶ 26, 29, 30.

Kavanaugh's declarations, prepared in 1996 and 2013, do not address the arguments

Malowane raised in her September 2015 declaration regarding: 1) use of more recent rate

surveys (one 2011 and two 2014 rate surveys); 2) the impact of flat rate fees on the CPI-LSI; or

3) the impact of firm size on billing rates.  Instead, Plaintiffs direct the court to other cases in this

district where fees have been awarded based on the LSI matrix.

Plaintiffs principally rely on Judge Kessler's opinion in *EPIC v. United States*

*Department of Homeland Security*, 218 F. Supp. 3d 27, 49 (D.D.C. 2016), in which the

government used the same Malowane declaration.  *See* 12-cv-333, ECF No. 86-4 (D.D.C. March

9, 2016). However, Judge Kessler noted that the Department of Homeland Security had recently conceded in another FOIA case—involving the same plaintiff—that the plaintiff was entitled to fees based on the LSI matrix. 218 F. Supp. 3d at 49. Furthermore, in addition to submitting Dr. Kavanaugh's declaration in support of its request for fees under the LSI matrix, EPIC had also submitted "billing rate tables and billing rate surveys." *Id*. Plaintiffs here have offered no such evidence. As Judge Kessler pointed out, "in any given case the burden is on the party seeking attorneys' fees to show that the LSI *Laffey* matrix should be used." *Id*. at 48 (quoting *Salazar*, 809 F.3d at 61).

Plaintiffs also rely on Judge Cooper's opinion in *CREW v. DOJ*, 80 F. Supp. 3d 1 (D.D.C. 2013). But in that case, Judge Cooper explained that "clients rarely" pay the rates quoted in surveys because law firms frequently discount rates, write off some of their billed time and/or fail to collect the amount billed. *Id*. at 5. Accordingly, even though Judge Cooper found that the LSI matrix was more closely aligned with Washington, D.C. rates for "relevant services," he also reduced plaintiff's fee award by fifteen percent "to account for the differences between reported rates and actual law firm billing realization." *Id*.

Plaintiffs also cite to *Salazar v. District of Columbia*, 750 F. Supp. 2d 70, 74 (D.D.C. 2011), in which Judge Kessler took issue with Malowane's declaration, and to the D.C. Circuit's opinion affirming her, in which it noted "the district court's point that 'the LSI-adjusted matrix is probably a <u>conservative</u> estimate of the actual cost of legal services in this area,' does not appear illogical." *Salazar ex rel. Salazar v. D.C.*, 809 F.3d 58, 65 (D.C. Cir. 2015) (emphasis in original).

Neither *Salazar* opinion compels a finding for Plaintiffs here. First, the Malowane declaration introduced by plaintiffs in *Salazar* is different from the declaration proffered here. The *Salazar* opinion was issued on January 4, 2011, while the Malowane declaration here was prepared several years later, in September 2015, and relies on a 2011 rate survey and two 2014 surveys. More importantly, the D.C. Circuit's affirmance was partially based on the fact that plaintiffs introduced "a great deal of evidence regarding the prevailing market rates for federal litigation," including billing rate tables, as well as "billing rate surveys," including surveys that showed the "rates for partners in Washington, D.C. on the high-end of the market far exceed[ed]" the LSI matrix rates. *Salazar*, 809 F. 3d at 64. In contrast, the defendant failed to "rebut[] this logic with relevant arguments." *Id*. at 65. Here, Plaintiffs have not submitted evidence beyond Kavanaugh's 1996 and December 2013 declarations, while State has presented rebuttal evidence in the form of Malowane's September 2015 declaration, which relies on more recent data.

Finally, Plaintiffs' reliance on Chief Judge Howell's decision in *Makray v. Perez*, 159 F. Supp. 3d 25, 51-53 (D.D.C. 2016) is also unavailing. Malowane's Declaration in *Makray* is longer and was prepared six months earlier than the one in this case. *See* 12-cv-520, ECF No. 88-1 (D.D.C. May 11, 2015). More importantly, the plaintiff in *Makray* also presented declarations from two senior litigation partners at Washington D.C. firms specializing in complex federal litigation, who averred that the LSI requested rates were either "reasonable and consistent" with, or "well below" market rates. *Makray*, 159 F. Supp. 3d at 47. The plaintiff also established that the requested rates were within $50 of the average hourly rate for partners surveyed by the National Law Journal in 2014. *Id*.

While the court recognizes that "[e]vidence submitted by attorney fee applicants in prior cases may also be relied on in compiling an attorney fee application" *Nat'l Ass'n of Concerned Veterans v. Sec'y of Def.*, 675 F.2d 1319, 1326–27 (D.C. Cir. 1982), Plaintiffs here rely on opinions, rather than evidence from prior decisions, and it is not this court's responsibility to scour the dockets in other cases to obtain the evidentiary basis for those decisions. Accordingly, this court is unable to find that Plaintiffs have met their burden of establishing that the LSI matrix rates are more reasonable. *See Makray*, 159 F. Supp. 3d at 47 (noting that district courts must undertake a "close review" of any "evidence submitted by the parties in connection with [a fee] petition.'") (citation omitted).

On the other hand, the court is not convinced that the lower rates in the USAO matrix are consistent with "the prevailing market rates in the relevant community." *See Eley*, 793 F.3d at 100; *see also Makray*, 159 F. Supp. 3d 25 (rejecting application of the USAO matrix); *CREW v. DOJ*, 80 F. Supp. 3d 1 (D.D.C. 2015) (same). Indeed, the USAO has implicitly admitted as much: on June 1, 2015 (approximately five months before the parties began briefing the fee petition in this case), the USAO introduced a new matrix

> based on data in a 2011 survey from ALM Legal Intelligence ("2011 ALM Survey") of hourly lawyer rates in the D.C. metropolitan area, which rates are adjusted annually using the Producer Price Index-Office of Lawyers ("PPI-OL") national index ("2015 USAO Matrix"). 2015–18 USAO Matrix, Explanatory Notes ¶ 2; *see also Elec. Privacy Info. Ctr. v. U.S. Drug Enf't Admin.* (*EPIC*), Civ. No. 15-00667 (CRC), 2017 WL 3049403, at *5 (D.D.C. July 18, 2017). The USAO acknowledges that methodology used in the 2015 USAO Matrix, which the USAO applies to attorney's fees incurred after May 2015, "better reflects the mix of legal services that law firms collectively offer," even though "it is a national index, and not a local one." 2015–18 USAO Matrix, Explanatory Notes ¶ 3.

*Nat'l Sec. Counselors v. CIA*, No. CV 11-444 (BAH), 2017 WL 5633091, at *6 (D.D.C. Nov. 21, 2017). Additionally, the 2015 USAO matrix contains higher rates than the old matrix and

divides the experience column into nine brackets, rather than the old matrix's five brackets. The highest experience column in the 2015 matrix is 31+ years, rather than 20+ years. [15]

State did not mention this new matrix in its opposition brief, even though the USAO stated in the 2015 matrix notes that the government

> will not oppose use of either "an updated *Laffey* Matrix computed using the prior [All Items CPI] methodology . . . for periods after May 2015," or the use of the "new [PPI-OL based] methodology . . . to calculate reasonable attorney's fees under applicable fee-shifting statutes for periods prior to June 2015," *id.* ¶ 5. Thus, at least three alternative methods for determining the prevailing market rate for hourly attorney's fees are sanctioned by the USAO (*i.e.*, USAO *Laffey* Matrix or 2015 USAO Matrix applied across the board; or USAO *Laffey* Matrix applied to fees incurred before June 2015 and 2015 USAO Matrix applied to fees incurred after May 2015).

*Nat'l Sec. Counselors*, 2017 WL 5633091, at *6 (quoting 2015–18 USAO Matrix, Explanatory Notes ¶ 5) (alterations in original).

Although the parties have not briefed the applicability of the 2015 matrix, the court takes judicial notice of the USAO's change of position on this issue during the pendency of the fee litigation in this case. It also notes that several judges have awarded fees in line with the new rates, despite opposition by Plaintiffs who sought fees under the LSI matrix. *See e.g.*, *Gatore v. U. S. Dep't of Homeland Sec.*, 286 F. Supp. 3d 25, 32-47 (D.D.C. 2017) (Walton, J.); *EPIC v. U. S. Drug Enf't Admin.*, 266 F. Supp. 3d 162, 170–71 (D.D.C. 2017) (Cooper, J.). The changes to the matrix, as well as the more recent survey data used to develop its rates, indicate that the 2015 version provides a more "a useful starting point," *Covington v. DC*, 57 F.3d 1101, 1109 (D.C. Cir. 1995), for calculating fees than does the prior version. Moreover, Plaintiffs have failed to

---

[15] The 2015 matrix can be found at: https://www.justice.gov/usao-dc/file/796471/download

meet their burden of establishing that the LSI's higher rates are justified, and have not fully addressed the concerns raised by State's expert regarding that matrix. Accordingly, the court will award fees based on the 2015 USAO matrix, but this decision "does not dictate the outcome in future cases," where parties may be able to provide "more robust evidentiary submissions enabling closer scrutiny of the relative merits of various attorney's fees rate schedules." *Nat'l Sec. Counselors*, 2017 WL 5633091, at *18 n.15.

## 2. Number of Hours Reasonably Expended on Prevailing Orders

State objects to the 31.8 hours McClanahan seeks because he has not provided his actual time records, and it is unclear how much of McClanahan's accrued hours should have been allocated to matters on which Plaintiffs succeeded, versus matters on which Plaintiffs did not.

Prevailing FOIA plaintiffs must submit records that "contain sufficiently detailed information about the hours logged and the work done. This is essential not only to permit the District Court to make an accurate and equitable award but to place government counsel in a position to make an informed determination as to the merits of the application." *Nat'l Ass'n of Concerned Veterans v. Sec'y of Def.*, 675 F.2d 1319, 1327 (D.C. Cir. 1982). Because successful FOIA plaintiffs may not receive fees for "nonproductive time or for time expended on issues on which plaintiff ultimately did not prevail," *Weisberg v. DOJ*, 745 F.2d 1476, 1499 (D.C. Cir. 1984) (quotation and citation omitted), it is difficult to analyze a fee application without billing information that includes the amount of time expended on both fruitful and non-fruitful tasks. Thus, "the fee application should . . . indicate whether nonproductive time or time expended on unsuccessful claims was excluded and, if time was excluded, the nature of the work and the number of hours involved should be stated." *Concerned Veterans*, 675 F.2d at 1327–28.

Moreover, when challenged about hours billed for such tasks, it is advisable for the plaintiff to "voluntarily make his time charges available for inspection by the District Court or opposing counsel on request." *Id.* at 1327.

The billing chart provided to the court does not provide sufficient information from which to determine whether the requested hours are "accurate and equitable." *See id.* While the chart does show how much time Plaintiffs' counsel spent on both successful and unsuccessful tasks related to drafting the first summary judgment motion and reviewing the first summary judgment memorandum opinion, the chart does not provide this type of break down for other matters. For example, the chart shows a July 22, 2013 entry for 3.5 hours to research and draft the opposition to a scheduling conference. *See* McClanahan Decl. p. 3. However, that opposition was primarily devoted to arguing that State should file a motion for an *Open America* stay—a position on which Plaintiffs did not prevail. *See* ECF Nos. 20, 23, 26. Thus, either the 3.5 hours represents only a portion of the time spent preparing the opposition, which should not have been the case, or it represents the total time spent on the motion, which was mostly unsuccessful. Likewise, on several occasions thereafter, Plaintiffs unsuccessfully argued that State was obligated to seek an *Open America* stay*,* but the chart provides no insight into how much time was attributable to making that argument, as opposed to successful arguments. *See*, *e.g.* ECF Nos. 25, 53, 73.

Given these deficiencies, the court will reduce the fee award by ten percent.

### 3. Fees on Fees

Although "'it is settled in this circuit that hours reasonably devoted to a request for fees are compensable, fees on fees must be reasonable, and not excessive.' This means the Court

must 'scrutinize' fees-on-fees petitions 'to insure that the total does not represent a windfall for the attorneys.'" *Cornucopia Inst. v. Agric. Mktg. Serv.*, 285 F. Supp. 3d 217, 227 (D.D.C. 2018) (citing *EPIC v. FBI*, 80 F. Supp. 3d 149, 162 (D.D.C. 2015)) (alterations omitted, and some citations omitted). Accordingly, the "fees on fees" calculation "may be reduced to reflect the degree of a plaintiff's success on the merits" of the fee petition. *EPIC v. United States Dep't of Homeland Sec.*, 218 F. Supp. 3d 27, 51 (D.D.C. 2016) (citing *Immigration and Naturalization Service v. Jean*, 496 U.S. 154, 163 n.10 (1990); *EPIC. v. U.S. Dep't of Homeland Security*, 999 F. Supp. 2d 61, 77 (D.D.C. 2013)).

The court finds that compensating Plaintiffs 5.6 hours for drafting the fee petition and reply brief would constitute an unsupportable windfall. Approximately three pages of the petition were devoted to the reasonableness of Plaintiffs' rates, but Plaintiffs have not prevailed on that issue. Moreover, the time billed for drafting the reply brief is excessive. Plaintiffs' counsel billed 1.4 hours for the original petition, which was eight pages long and included McClanahan's Declaration, as well as other exhibits. *See* ECF No. 68. In contrast, Plaintiffs seek 4.2 hours for the eleven-page reply. Pls. Reply p. 11. Of those eleven pages, more than one full page was devoted to the issue of eligibility, even though State had already conceded that issue. *Id*. pp. 2-3. The reply also contained close to three pages of discussion about State's failure to refer to Plaintiffs in the plural throughout this litigation and in their response to the fee petition. *See id*. pp. 3-6. This section appears to have been designed to remind the court—as Plaintiffs have <u>repeatedly</u> done in past filings—that Truthout is also a Plaintiff and that this dispute involved more than the personal interest of a disgruntled employee. This three-page reminder was unnecessary.

Slightly more than two pages of the reply were devoted to arguing the reasonableness of the hours/rates, but for the most part, those arguments contained generic quotations from other cases critiquing Dr. Malowane's methodology. While some of those criticisms were valid, the reply failed to offer any evidentiary support that might rebut some of the concerns Malowane raised in her report. Given these shortcomings, the court will reduce the "fees-on-fees" amount by fifty percent.

### III.   CONCLUSION

For the reasons discussed above, the court will award fees and costs in the amount of $11,726.97, consistent with the calculations found on the chart attached to this Memorandum Opinion.

Date:  September 30, 2018

TANYA S. CHUTKAN
United States District Judge

| 2015 USAO Rates    Attorney McClanahan JD earned 5/2007 | | | | |
|---|---|---|---|---|
| **FOIA LITIGATION** | | | | |
| Time Period | Applicable Rate | Number of hours spent | Total: | **Subtotals** |
| Before June 1, 2013 6th year of practice | $332/hour | 4.7 | $1,560.4 | |
| June 1, 2013-May 31, 2014 7th year of practice | $332/hour | 8.7 | $2,888.4 | |
| June 1, 2014-May 31, 2015 8th year of practice | $386/hour | 14.9 | $5,751.4 | |
| June 1, 2015-May 31 2016 9th year of practice | $386/hour | 2.1 | $810.6 | |
| Subtotal | | | $11,010.8 | |
| **Less 10%** | | | $1,101.08 | |
| **Total** | | | $9,909.72 | 9,909.72 |
| | | | | |
| **FEE LITIGATION** | | | | |
| June 1, 2016 -  May 31, 2017 Fee Petition 9th year of practice | $395/hour | 1.4 | $553 | |
| June 1, 2016 – May 31, 2017 Fee Reply Brief 9th year of practice | $395/hour | 4.2 | $1659 | |
| Subtotal | | | $2,212 | |
| **Less 50%** | | | $1106 | |
| **Total** | | | $1,106 | 1,106 |
| | | | | |
| COSTS | | | | |
| Costs | | | $711.25 | 711.25 |
| | | | | |
| **Total** | | | | **$11,726.97** |
| | | | | |